COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-05-398-CR

MARIO ALBERTO RODRIGUEZ

A/K/A MARIO RODRIGUEZ APPELLANT

V.

THE STATE OF TEXAS STATE

------------

FROM THE 213TH DISTRICT COURT OF TARRANT COUNTY

------------

MEMORANDUM
 
OPINION
(footnote: 1)

------------

I. Introduction

In seven issues, Appellant Mario Alberto Rodriguez a/k/a Mario Rodriguez appeals his conviction of serious bodily injury to a child.  We affirm.

II. Factual and Procedural Background

On September 8, 2004, Mario was babysitting his live-in girlfriend Veronica Santos’s three-year-old daughter, Diana Santos, so Veronica could go to work.  That night while Diana was practicing writing the letters of the alphabet, Mario, angry with Diana for the way she wrote her letters, hit her two to three times on the head with enough force that she fell and hit her head on the floor.  Mario claimed that Diana got up from the floor, took a bath, and then ate dinner.  However, the medical examiner testified that Diana’s head injury would have caused her to lose consciousness within minutes and that there would be no lucid period or interval.

At some point, Diana began vomiting blood.  Instead of taking Diana to the hospital, Mario left her alone at the house to go pick Veronica up from work.  When Veronica and Mario returned home, Diana was not moving and was unresponsive.  Veronica wrapped Diana up in a bed sheet and, along with Mario, took Diana to John Peter Smith Hospital.  Shortly thereafter, Diana was transferred to Cook Children’s Medical Center.

When Diana arrived at Cook Children’s Medical Center, she was  intubated and bleeding profusely from her mouth.  She was not breathing on her own and an endotracheal tube had to be pumped manually to get air into her lungs.  A head-to-toe assessment of Diana revealed bruising on Diana’s lip, a large bruise on the right side of her head in the occipital parietal area, and bruises on her back.  Diana’s eyes were fixed and dilated, which suggested some kind of “major head injury.”  Moreover, the CAT scan of Diana’s head was very abnormal.  The CAT scan revealed Diana had diffuse cerebral edema (brain swelling all over), a subarachnoid hemorrhage (blood between the layers of the covering of the brain), blood inside the ventricles of the brain, blood where spinal fluid should be, a skull fracture, and large swelling in the back of her head.  There was testimony that injuries such as these are caused by “massive force.”

Diana died at 1:21 p.m. on September 9, 2004.  The medical examiner testified that Diana’s head injuries were consistent with being swung, slammed, or thrown against a hard surface.  The type of force required to produce Diana’s head injury would be the equivalent of a thirty-mile-per-hour car accident on an unrestrained person.  Diana’s death was classified as a homicide.

Homicide detective Cheryl Johnson was dispatched to the hospital. Detective Johnson asked Mario and Veronica to accompany her to the police station to determine what had caused Diana’s injuries.  However, before leaving the hospital, Detective Johnson informed Mario and Veronica that they were not under arrest and were free to leave at any time.

At the police station Detective Jose Hernandez was called in to translate for Mario in Spanish.  About twenty minutes into the conversation, Detective Hernandez decided to read Mario the Spanish version of the 
Miranda
 warnings. Mario waived his rights and voluntarily spoke with Detective Hernandez. Although Detective Hernandez read Mario his 
Miranda 
warnings, he was not under arrest and was free to leave at any time.  Because Mario was not under arrest or detention, Detective Hernandez did not notify the Mexican Consulate. During the interview, Mario admitted that he had hit Diana twice on the head and that the force from the first blow caused Diana to fall and hit her head on the floor.  After the interview was completed, Detective Johnson placed Mario in custody.

At trial, the jury found Mario guilty of serious bodily injury to a child and  assessed punishment at fifty years’ confinement.

III. Vienna Convention

In his first issue, Mario claims the trial court erred by overruling his objections and his motion to suppress evidence due to the police’s failure to notify the Mexican Consulate of his arrest and detention.  In sum, Mario argues that his confession to police should have been excluded from evidence based on the detective’s alleged violations of the Vienna Convention.  We have previously addressed this issue in 
Sierra v. State
.  157 S.W.3d 52, 59–60 (Tex. App.—Fort Worth 2004, pet. granted).  Because we again hold that the exclusionary rule is not an appropriate enforcement mechanism for Vienna Convention violations, we need not address Mario’s contention that the Vienna Convention confers an individual right to consular notification.  Likewise, we need not determine whether Mario was detained under the meaning of the Vienna Convention or whether he established a causal connection between the violation of the convention and the making of his statements.   

Article 36 of the Vienna Convention provides that when nationals from participating countries are arrested in the United States, the authorities are required to inform the foreign national without delay that he has a right to contact his nation’s consulate.  Vienna Convention on Consular Relations art. 36(1)(b), Apr. 24, 1963, 21 U.S.T. 77, 596 U.N.T.S. 261.  Additionally, the consular officials from the foreign country shall have the right to visit their nationals in custody in the United States.  
Id.
 art. 36(1)(c).  Appellant argues that his confession should have been suppressed because the police never notified him that, as a Mexican national, he had a right to contact the Mexican Consulate, nor did the police contact the consulate on his behalf.  We disagree.

The Texas Court of Criminal Appeals’ decision 
Rocha v. State 
is the controlling law in this case.  16 S.W.3d 1, 19 (Tex. Crim. App. 2000).  The court in 
Rocha
 held that the article 38.23(a) exclusionary rule of the Texas Code of Criminal Procedure does not apply to violations of treaties.  
Id.
 at 18–19; 
see also
 
Tex. Code Crim. Proc. Ann.
 art. 38.23(a) (Vernon 2005).  Absent contrary directions from the United States Supreme Court, the court of criminal appeals stated that it would not enforce Vienna Convention violations claimed under the federal exclusionary rule.  
Rocha
, 16 S.W.3d at 19.   This court is bound by the precedent of the Texas Court of Criminal Appeals and has no authority to disregard or overrule the precedent in 
Rocha
.  
See Wiley v. State
, 112 S.W.3d 173, 175 (Tex. App.—Fort Worth 2003, pet. ref’d).  Accordingly, we hold that the trial court did not err by overruling Mario’s objections and denying his motion to suppress on this ground.  Therefore, we overrule Mario’s first issue.   

IV. Police Interpreter 

In his second issue, Mario complains that the trial court erred by allowing testimony from an uncertified police interpreter regarding Mario’s allegedly incriminating statements.  Detective Hernandez interviewed Mario in Spanish and a portion of the interview was tape recorded.  The taped portion of the interview was translated by a certified court interpreter.  The trial court allowed into evidence Mario’s statements made to Detective Hernandez before the recorder was turned on
.

Article 38.30(a) of the Texas Code of Criminal Procedure is the relevant statute, which provides in pertinent part:

When a motion for appointment of an interpreter is filed by any party or on motion of the court, in any criminal proceeding, it is determined that a person charged or a witness does not understand and speak the English language, an interpreter must be sworn to interpret for [him].  Any person may be subpoenaed, attached or recognized in any criminal action or proceeding, to appear before the proper judge or court to act as interpreter therein, under the same rules and penalties as are provided for witnesses. 

Tex. Code Crim. Proc. Ann.
 art. 38.30(a) (Vernon Supp. 2006).  By its very terms, article 38.30(a) governs the use of interpreters in court proceedings, not police interviews.  What Mario is proposing would require every bilingual police officer to be a certified interpreter in order to testify to a suspect’s incriminating statements or to record every conversation with a non-English speaking suspect.  The statute simply does not require this.  Had the legislature had desired to impose this requirement, it would have done so.  “Where the statute is clear and unambiguous[,] the Legislature must be understood to mean what it has expressed, and it is not for the courts to add or subtract from such a statute.”  
Coit v. State
, 808 S.W.2d 473, 475 (Tex. Crim. App. 1991).

Mario also complains that Detective Hernandez was not proven to have the interpretation skills required to admit evidence under Texas law.  We disagree.  The evidence shows that Detective Hernandez spoke and understood both English and Spanish.  Detective Hernandez testified that he had spoken Spanish all of his life, tested out of Spanish in college, and passed a test which enabled him to be a translator for the Fort Worth Police Department.  The licensed transcription of the audiotaped portion of the interview establishes that Detective Hernandez was able to converse with Mario in Spanish without an interpreter and then testify in English concerning that conversation.

In summary,  Mario has not pointed us to any authority, nor have we discovered any, that would require exclusion of Detective Hernandez’s testimony.  Accordingly, we overrule Mario’s second issue.  

V. Motion to Suppress Physical Evidence

In his third issue, Mario asserts that the trial court erred by overruling his motion to suppress evidence and by allowing introduction of incriminating evidence recovered from Mario’s residence.  Specifically, Mario claims that a close reading of the search warrant and supporting affidavit shows that there were insufficient facts stated to establish probable cause to search for and seize the items.  We disagree. 

When reviewing a magistrate’s 
determination of probable cause to issue a search warrant, 
we apply the deferential standard of review articulated by the United States Supreme Court in 
Illinois v. Gates
, 462 U.S. 213, 236, 103 S. Ct. 2317, 2331 (1983).  Under this standard, we uphold the probable cause determination “so long as the magistrate had a ‘substantial basis for . . . conclud[ing]’ that a search would uncover evidence of wrongdoing.”  
Id.
 at 236, 103 S. Ct. at 2331 (quoting 
Jones v. United States
, 362 U.S. 257, 271, 80 S. Ct. 725, 736 (1960), 
overruled on other grounds by U.S. v. Salvucci
, 448 U.S. 83, 100 S. Ct. 2547 (1980)); 
see Swearingen v. State
, 143 S.W.3d 808, 810 (Tex. Crim. App. 2004).
 

In assessing the sufficiency of an affidavit for a search warrant, we are limited to the four corners of the affidavit.  
Hankins v. State
, 132 S.W.3d 380, 388 (Tex. Crim. App.), 
cert. denied
, 125 S. Ct. 358 (2004); 
Jones v. State
, 833 S.W.2d 118, 123 (Tex. Crim. App. 1992), 
cert. denied
, 507 U.S. 921 (1993).  Furthermore, we interpret the affidavit in a common sense and realistic manner, recognizing that the magistrate was permitted to draw reasonable inferences.  
Hankins
, 132 S.W.3d at 388; 
Jones
, 833 S.W.2d at 124.

Detective Johnson submitted a search warrant affidavit for the residence where Mario, Veronica, and Diana lived together and the offense occurred.  In the affidavit, Detective Johnson described the premises to be searched, stated her belief that the offense of injury to a child—serious bodily injury had been committed, and stated that evidence including blood, weapons, bedding, photographs, and other evidence related to the offense could be found on the premises.  The facts Detective Johnson set out in order to establish probable described the extent and seriousness of Diana’s injuries and referenced Diana being injured while inside the home.

Based on the facts alleged in the affidavit, we conclude that the magistrate had a substantial basis for concluding that a search would uncover evidence of wrongdoing, and we therefore uphold the probable cause determination
.  
Gates
, 462 U.S. at 236, 103 S. Ct. at 2331.  Furthermore, our common sense and realistic 
 interpretation of the affidavit shows that the magistrate drew reasonable inferences from the information contained therein.  
Hankins
, 132 S.W.3d at 388; 
Jones
, 833 S.W.2d at 124.

We overrule Mario’s third issue.

VI. Admission of Photographs 

In his fourth issue, Mario claims the trial court erred and abused its discretion by admitting, over objection, photographs of Diana.  Mario asserts that the prejudicial effect of the photographs substantially outweighed their probative value.  Again, we disagree.  

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence.  
Tex. R. Evid.
 403.  The admissibility of photographs over a challenge is within the sound discretion of the trial court.  
Moreno Denoso v. State
, 156 S.W.3d 166, 177 (Tex. App.—Corpus Christi 2005, pet. ref’d); 
see Rojas v. State
, 986 S.W.2d 241, 249 (Tex. Crim. App. 1998); 
Montgomery v. State
, 810 S.W.2d 372, 378–80 (Tex. Crim. App. 1990).  The trial court’s decision will be reversed only if it was “outside the zone of reasonable disagreement.” 
 Moreno Denoso
, 156 S.W.3d at 177 (quoting
 Narvaiz v. State
, 840 S.W.2d 415, 429 (Tex. 1992), 
cert. denied
, 507 U.S. 975 (1993)).

A court may consider the following factors in determining whether the probative value of photographs is substantially outweighed by the danger of unfair prejudice:  (1) the number of exhibits offered, (2) their gruesomeness, (3) their detail, (4) their size, (5) whether they are offered in color or in black and white, (6) whether they are close-up, and (7) whether the body depicted is clothed or naked.  
Sosa v. State
, Nos. 14-03-01116-CR, 14-03-01117-CR, 14-03-01118-CR, 2005 WL 171352, at *3 (Tex. App.—Houston [14th Dist.] Jan. 27, 2005, pet. ref’d); 
see Rojas
, 986 S.W.2d at 249.  Autopsy photographs are generally admissible unless they depict mutilation caused by the autopsy itself.  
Frank v. State
, 183 S.W.3d 63, 77 (Tex. App.—Fort Worth 2005, pet. ref’d); 
see Rojas
, 986 S.W.2d at 249.  Photographs that depict the nature, location, and extent of a wound have been declared probative enough to outweigh any prejudicial effect.  
Frank
, 183 S.W.3d at 78; 
see Legate v. State
, 52 S.W.3d 797, 807 (Tex. App.—San Antonio 2001, pet. ref’d). 

Here, Mario complains of the admission of two sets of photographs.  State’s Exhibits 21 through 23 are eight-by ten-inch color photographs of Diana in the hospital.  The photographs were introduced into evidence during the testimony of Dr. Yancy, who treated Diana at Cook Children’s Medical Center. The photographs showed Diana with medical equipment and showed the wounds to her head and back.  Dr. Yancy testified that the photographs accurately depicted Diana’s appearance on September 9, 2004.  Dr. Yancy also testified to the nature and severity of Diana’s multiple injuries.  Visual evidence accompanying oral testimony is not cumulative or of insignificant probative value.  
Chamberlain v. State
, 998 S.W.2d 230, 237 (Tex. Crim. App. 1999), 
cert. denied
, 528 U.S. 1082 (2000).  Therefore, we hold that the probative value of the hospital photographs was not substantially outweighed by the danger of unfair prejudice.  
See 
Tex. R. Evid.
 403.  Accordingly, the trial court did not abuse its discretion by admitting State’s Exhibits 21 through 23.  
See Frank
, 183 S.W.3d at 78.   

The second set of photographs Mario complains of are Diana’s autopsy photographs.  State’s Exhibits 24 through 31 are eight-by ten-inch color autopsy photographs of Diana admitted during the testimony of Dr. Sisler, the medical examiner who performed Diana’s autopsy.  Dr. Sisler testified that the autopsy photographs would assist the jury in understanding the nature of Diana’s injuries.  State’s Exhibits 24
(footnote: 2) and 25
(footnote: 3) show injuries to Diana’s back, and State’s Exhibit 26 depicts the bruising on Diana’s lower lip.  State’s Exhibits 27 through 31 depict Diana’s extensive head injuries.  Some of the head photographs reveal Diana’s scalp pulled back to show the bleeding underneath Diana’s scalp.  Other photographs show Diana’s swollen exposed brain and depict the pooling of blood on the brain.  The admitted photographs are gruesome and show a considerable amount of blood on the brain.  However, the photographs depict the wounds Diana suffered and are no more gruesome than the facts of the offense itself.  
See Sosa
, 2005 WL 171352, at *3; 
see also Sonnier v. State
, 913 S.W.2d 511, 519 (Tex. Crim. App. 1995).

Dr. Sisler testified that the manner of Diana’s death was homicide and that the cause of death was blunt force trauma to the head.  He further testified about her injuries and the blood found on her brain, which is typically not supposed to be there.  The autopsy photographs, coupled with Dr. Sisler’s testimony, provided crucial evidence of the severe force used by Mario to inflict Diana’s injuries.  Therefore, we hold that the probative value of the photographs was not substantially outweighed by their prejudicial effect.  
See
 
Tex. R. Evid 403.
 Thus, the trial court did not abuse its discretion by admitting State’s Exhibits 24 through 31.  
See Frank
, 183 S.W.3d at 78.   

We overrule Mario’s fourth issue.

VII. Knowing or Reckless

In his fifth issue, Mario asserts that the trial court erred by overruling his motion for an instructed verdict because there was insufficient evidence that he 
knowingly
 committed the offense.  In his sixth issue, Mario contends the trial court erred by refusing to charge the jury on the lesser included offense of reckless injury to a child.  Because Mario’s contentions under his fifth and sixth issues both relate to the lesser included offense of reckless injury to a child we shall discuss them jointly.

A. Standards of Review 

1. Motion for Instructed Verdict 

A challenge to the denial of a motion for instructed verdict is actually a challenge to the legal sufficiency of the evidence.  
Madden v. State
, 799 S.W.2d 683, 686 (Tex. Crim. App. 1990), 
cert. denied
, 499 U.S. 954 (1991);  
Jackson v. State
, 50 S.W.3d 579, 597 (Tex. App.—Fort Worth 2001, pet. ref’d).
  
In reviewing the legal sufficiency of the evidence to support a conviction, we view all the evidence in the light most favorable to the verdict in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  
Jackson v. Virginia
, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); 
Hampton v. State
, 165 S.W.3d 691, 693 (Tex. Crim. App. 2005).  This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.  
Jackson
, 443 U.S. at 319, 99 S. Ct. at 2789. 

Mario was charged with and convicted of knowingly causing serious bodily injury to a child. 
 See 
Tex. Penal Code Ann.
 § 22.04(a)(1) (Vernon Supp. 2006).
 
 
Because injury to a child is a result-oriented crime, the culpable mental state relates to the result of the defendant’s conduct, and the conduct must be done with the required culpability to effect the result.  
See Patterson v. State
, 46 S.W.3d 294, 301 (Tex. App.—Fort Worth 2001, no pet.).  Proof of a culpable mental state generally relies upon circumstantial evidence and ordinarily must be inferred from the acts, words, and conduct of the accused and the surrounding circumstances.  
See Moore v. State
, 154 S.W.3d 703, 712 (Tex. App.—Fort Worth 2004, pet. ref’d).  
The trier of fact is the sole judge of the weight and credibility of the evidence.  
See
 Tex. Code Crim. Proc. Ann.
 art. 38.04 (Vernon 1979); 
Margraves v. State
, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000).  Thus, when performing a legal sufficiency review, we may not re-evaluate the weight and credibility of the evidence or substitute our judgment for that of the fact-finder.  
Dewberry v. State
, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999), 
cert. denied
, 529 U.S. 1131 (2000).  We must resolve any inconsistencies in the evidence in favor of the verdict.  
Curry v. State
, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).
  
  

2. Requested Charge on Lesser Included Offense 

To determine whether a jury must be charged on a lesser included offense, we apply a two-step analysis.  
Salinas v. State
, 163 S.W.3d 734, 741 (Tex. Crim. App. 2005); 
Moore v. State
, 969 S.W.2d 4, 8 (Tex. Crim. App. 1998).  The first step is to decide whether the offense is a “lesser included offense” as defined in article 37.09 of the code of criminal procedure.  
Tex. Code Crim. Proc. Ann.
 art. 37.09 (Vernon 2006); 
Salinas
, 163 S.W.3d at 741; 
Moore
, 969 S.W.2d at 8.  “An offense is a lesser included offense if . . . it is established by proof of the same or less than all the facts required to establish the commission of the offense charged.”  
Tex. Code Crim. Proc. Ann.
 art. 37.09(1).  Here, the State concedes that reckless injury to a child can be a lesser included offense of knowing injury to a child.  Thus, the first prong is met.  

Second, some evidence must exist in the record that would permit a jury to rationally find that if the defendant is guilty, he is guilty only of the lesser offense. 
 Salinas
, 163 S.W.3d at 741; 
Rousseau v. State
, 855 S.W.2d 666, 672–73 (Tex. Crim. App.), 
cert. denied
, 510 U.S. 919 (1993); 
Royster v. State
, 622 S.W.2d 442, 446 (Tex. Crim. App. 1981).  The credibility of the evidence and whether it conflicts with other evidence or is controverted may not be considered in determining whether the lesser included offense should be submitted.  
See Gadsden v. State
, 915 S.W.2d 620, 622 (Tex. App.—El Paso 1996, no pet.).  Regardless of its strength or weakness, if more than a scintilla of evidence raises the issue that the defendant was guilty only of the lesser offense, the charge must be given.  
Bignall v. State
, 887 S.W.2d 21, 23 (Tex. Crim. App. 1994);  
Saunders v. State
, 840 S.W.2d 390, 391 (Tex. Crim. App. 1992).  In deciding whether a lesser included offense instruction is warranted, we are required to view the evidence in the light most favorable to Mario and give him the benefit of reasonable inferences from the evidence, without regard to whether it is credible, controverted, or in conflict with other evidence.  
Curtis
, 89 S.W.3d at 179.

An accused is guilty only of a lesser included offense if there is evidence that affirmatively rebuts or negates an element of the greater offense or if the evidence is subject to different interpretations, one of which rebuts or negates the crucial element.  
See Schweinle v. State
, 915 S.W.2d 17, 19 (Tex. Crim. App. 1996); 
Ramirez v. State
, 976 S.W.2d 219, 226–27 (Tex. App.—El Paso 1998, pet. ref’d).  It is not enough that the jury may disbelieve crucial evidence pertaining to the greater offense.  
See Skinner v. State
, 956 S.W.2d 532, 543 (Tex. Crim. App. 1997),
 cert. denied
, 523 U.S. 1079 (1998). 

3. Culpable Mental States  

Section 22.04(a)(1) of the Texas Penal Code defines the offense of serious bodily injury to a child.  It provides in relevant part that a person commits an offense if he knowingly or recklessly, by act or omission, causes serious bodily injury to a child. 
 See
 
Tex. Penal Code Ann.
 § 22.04(a)(1).  The penal code defines the relevant culpable mental states as follows:

(b) A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist.  A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

(c) A person acts recklessly, or is reckless, with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur.  The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor’s standpoint.

Tex. Penal Code Ann.
 § 6.03(b), (c) (Vernon 2003).  Injury to a child is a result-oriented or “result of conduct” crime.  That is, the culpable mental state relates not to the nature of or circumstances surrounding the charged conduct, but to the result of the defendant’s conduct.  
See Patterson
, 46 S.W.3d at 301.  Thus, because injury to a child is a “result of conduct” crime, proof that a defendant knowingly “caused” injury to a child requires evidence that the defendant was aware with reasonable certainty that the injury would result from his conduct.  
Thornton v. State
, 994 S.W.2d 845, 849 (Tex. App.—Fort Worth 1999, pet. ref’d). 

B. Application 

We shall therefore examine the evidence to determine (1) if there is no evidence that Mario committed the crime of knowingly causing serious bodily injury to a child and (2) if there is some evidence that if Mario is guilty he is not guilty of knowingly causing serious bodily injury to a child but only of recklessly causing serious bodily injury to a child.  
See Salinas
, 163 S.W.2d at 745.  

Here Mario argues that his description of the events as a “reaction” and a “fit” established the suddenness of his actions and raised the issue of recklessness.  It is undisputed that Mario struck Diana in the head more than once with extreme force.  Based upon the considerable medical testimony and other evidence, it is also clear that these blows caused Diana’s serious bodily injuries and ultimately led to her death.

Any adult, such as Mario, would be aware with reasonable certainty that serious injury would result from striking a three-year-old several times in the head with extreme force.  
See Thornton
, 994 S.W.2d at 849.  Based on our review of this evidence in the light most favorable to the verdict, we hold that there is evidence of Mario’s guilt of knowingly causing serious bodily injury to a child and 
determine that a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  
Jackson
, 443 U.S. at 319, 99 S. Ct. at 2789; 
Hampton
, 165 S.W.3d at 693
.  
Further, since Mario would have known with reasonable certainty that his actions were directly harmful to Diana and did not merely create an unjustifiable 
risk
 of harm but were necessarily harmful to her, we hold that the evidence does not support the theory that Mario might 
only
 be guilty of reckless injury to a child.  
See Downing v. State
, 761 S.W.2d 881, 883 (Tex. App.—Fort Worth 1988, writ ref’d).

We overrule Mario’s fifth and sixth issues. 

VIII. State’s Comment Regarding Mario’s Failure to Testify 

In his final issue, Mario argues that the trial court erred in overruling his motion for mistrial after sustaining his objection and instructing the jury to disregard the prosecutor’s comment on Mario’s failure to testify.  At trial Mario objected to two portions of the State’s argument.  The first portion of the objected to argument was as follows:

[Prosecutor:] You’ve heard a little bit about the Defendant saying it was a reaction.  It was a fit.  Ladies and gentlemen, causing that kind of head trauma to a poor, defenseless little girl, a three year old who wasn’t doing anything but writing her alphabet, he knew what he was doing.  And how do you know that?  Because he admits to you that he hit her more than once.  It’s plain and simple.  He knew what he was doing on that day.  And let’s talk about some of the things that the defendant told you. 

At this point defense counsel objected that this was a reference to Mario’s failure to testify.  The trial court sustained the objection and instructed the jury to disregard, but denied Mario’s motion for a mistrial.

To constitute reversible error, the contested jury argument must be extreme or manifestly improper, or it must inject new and harmful facts into evidence.  
Sandoval v. State
, 52 S.W.3d 851, 857 (Tex. App.—Houston [1st Dist.] 2001, pet. ref’d).  Except in the most blatant cases, an instruction to disregard a comment on an accused’s failure to testify will cure any prejudicial effect caused by the improper comment. 
 Moore v. State
, 999 S.W.2d 385, 405 (Tex. Crim. App. 1999), 
cert. denied
, 530 U.S. 1216 (2000); 
Fuentes v. State
, 991 S.W.2d 267, 275 (Tex. Crim. App.), 
cert. denied
, 528 U.S. 1026 (1999)
. 

When the trial court sustains an objection and instructs the jury to disregard but denies a defendant’s motion for a mistrial, the issue is whether the trial court abused its discretion in denying the mistrial.  
Hawkins v. State
, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004).  Only in extreme circumstances, when the prejudice caused by the improper argument is incurable, i.e., “so prejudicial that expenditure of further time and expense would be wasteful and futile,” will a mistrial be required.  
Id.
 (quoting 
Ladd v. State, 
3 S.W.3d 547, 567 (Tex. Crim. App. 1999), 
cert. denied
, 529 U.S. 1070 (2000))
; see also Simpson v. State,
 119 S.W.3d 262, 272 (Tex. Crim. App. 2003), 
cert. denied,
 542 U.S. 905 (2004).  In determining whether the trial court abused its discretion in denying the mistrial, we balance three factors:  (1) the severity of the misconduct (prejudicial effect), (2) curative measures, and (3) the certainty of conviction absent the misconduct.  
Hawkins,
 135 S.W.3d at 77; 
Mosley v. State
, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh’g), 
cert. denied
, 526 U.S. 1070 (1999).

Based upon the evidence presented at trial, we conclude that the State’s argument was referring to Mario’s out-of-court statements that had been admitted into evidence.  Thus, the argument did not inject new and harmful facts into evidence, nor can it be categorized as extreme or manifestly improper.  
See Sandoval
, 52 S.W.3d at 857.  Weighing the appropriate factors, we hold that the trial court did not abuse its discretion by denying Mario’s motion for a mistrial because, (1) the misconduct, if any, was slight
, (2) the trial court instructed the jury to disregard the complained of argument, and (3) even without the argument there was overwhelming evidence of Mario’s guilt supporting conviction.  Thus, we hold the trial court did not abuse its discretion by denying Mario’s request for a mistrial.  
See 
Hawkins,
 135 S.W.3d at 77
.    
 After defense counsel’s motion for a mistrial was denied, the State’s argument continued:

[Prosecutor:] Let’s talk about the first thing that the Defendant told Vanessa.  “I don’t know what happened.”  When he calls her on the phone, he says, “I don’t know what happened.”  When they get to the hospital and they’re in the trauma room and then Thomas Hassan, the patient advocate for Cook’s, what does he tell Thomas?  “Well, I think maybe she fell and hit her head at the post office.”  

Then we get down to the point where the police are involved, and he voluntarily makes a statement, he says, “I hit her twice.”  He didn’t just hit her once.  He hit her twice, and he demonstrated for the detective how he did it.  He hit her on the head.  

And it’s not like somebody hitting me on the head or a grownup on the head.  We’re talking about a fragile three year old little girl.  The medical examiner testified, Dr. Sisler, and you heard what he said.  This kind of head trauma would have come out of a fall from a second story window.  This kind of head trauma would be sustained in a car accident at 30 miles an hour from an unrestrained passenger.

This is not a slap.  This is not just merely hitting somebody in the head.  This is serious head trauma.  And he also told you that a child suffering this kind of head trauma—

At this point defense counsel again objected that this argument was a comment on Mario’s failure to testify.  The objection was overruled.

To determine if a prosecutor’s comment violated article 38.08 and constituted an impermissible reference to an accused’s failure to testify, we must decide whether the language used was manifestly intended or was of such a character that the jury naturally and necessarily would have considered it to be a comment on the defendant’s failure to testify.  
Tex. Code Crim. Proc. Ann.
 art. 38.08 (Vernon 2005); 
see Bustamante v. State
, 48 S.W.3d 761, 765 (Tex. Crim. App. 2001); 
Fuentes,
 991 S.W.2d at 275.  The offending language must be viewed from the jury’s standpoint, and the implication that the comment referred to the accused’s failure to testify must be clear.  
Bustamante
, 48 S.W.3d at 765; 
Swallow v. State
, 829 S.W.2d 223, 225 (Tex. Crim. App. 1992).  A mere indirect or implied allusion to the defendant’s failure to testify does not violate the accused’s right to remain silent.  
Wead v. State
, 129 S.W.3d 126, 130 (Tex. Crim. App. 2004); 
Patrick v. State
, 906 S.W.2d 481, 490
–
91 (Tex. Crim. App. 1995), 
cert. denied
, 517 U.S. 1106 (1996).

Here, we hold that this contested argument did not comment on Mario’s failure to testify.  It is clear from the context of the argument that the State was referring the jury back to the medical examiner’s testimony regarding Diana’s trauma.  Because the State’s argument did not reference Mario, we hold that 
the State’s argument was not manifestly intended or of such a character that the jury naturally and necessarily would have considered it to be a comment on the defendant’s failure to testify.  
Tex. Code Crim. Proc. Ann.
 art. 38.08; 
see Bustamante
, 48 S.W.3d at 765; 
Fuentes
, 991 S.W.2d at 275.

We overrule Mario’s final issue.

IX. Conclusion

Having overruled Mario’s seven issues, we affirm the trial court’s judgment.  

BOB MCCOY

JUSTICE

PANEL B: LIVINGSTON, GARDNER, and MCCOY, JJ.

DO NOT PUBLISH

Tex. R. App. P.
 47.2(b)

DELIVERED: January 25, 2007

 

      

 

FOOTNOTES
1:
See 
Tex. R. App. P.
 47.4.

2:
Depicts contusions on Diana’s right back.

3:
Depicts longitudinal incisions into the skin and underlying tissue to determine the depth of bruising to Diana’s back.  The cuttings show extensive soft tissue hemorrhage extending to the depth of the muscle of the back.