COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO. 2-05-398-CR

 

 

MARIO
ALBERTO RODRIGUEZ

A/K/A
MARIO RODRIGUEZ                                                    APPELLANT

 

                                                   V.

 

THE
STATE OF TEXAS                                                                STATE

 

                                              ------------

 

 

           FROM THE 213TH
DISTRICT COURT OF TARRANT COUNTY

 

 

                                              ------------

 

 

                                MEMORANDUM OPINION[1]

 

 

                                              ------------

I. Introduction

In seven issues, Appellant Mario Alberto Rodriguez a/k/a Mario
Rodriguez appeals his conviction of serious bodily injury to a child.  We affirm.








II. Factual and Procedural Background

On September 8, 2004, Mario was babysitting his live-in girlfriend
Veronica Santos=s
three-year-old daughter, Diana Santos, so Veronica could go to work.  That night while Diana was practicing writing
the letters of the alphabet, Mario, angry with Diana for the way she wrote her
letters, hit her two to three times on the head with enough force that she fell
and hit her head on the floor.  Mario
claimed that Diana got up from the floor, took a bath, and then ate
dinner.  However, the medical examiner
testified that Diana=s head
injury would have caused her to lose consciousness within minutes and that
there would be no lucid period or interval.

At some point, Diana began vomiting blood.  Instead of taking Diana to the hospital,
Mario left her alone at the house to go pick Veronica up from work.  When Veronica and Mario returned home, Diana
was not moving and was unresponsive. 
Veronica wrapped Diana up in a bed sheet and, along with Mario, took
Diana to John Peter Smith Hospital. 
Shortly thereafter, Diana was transferred to Cook Children=s Medical Center.








When Diana arrived at Cook Children=s Medical Center, she was 
intubated and bleeding profusely from her mouth.  She was not breathing on her own and an
endotracheal tube had to be pumped manually to get air into her lungs.  A head-to-toe assessment of Diana revealed
bruising on Diana=s lip, a
large bruise on the right side of her head in the occipital parietal area, and
bruises on her back.  Diana=s eyes were fixed and dilated, which suggested some kind of Amajor head injury.@  Moreover, the CAT scan of
Diana=s head was very abnormal.  The
CAT scan revealed Diana had diffuse cerebral edema (brain swelling all over), a
subarachnoid hemorrhage (blood between the layers of the covering of the
brain), blood inside the ventricles of the brain, blood where spinal fluid
should be, a skull fracture, and large swelling in the back of her head.  There was testimony that injuries such as
these are caused by Amassive
force.@

Diana died at 1:21 p.m. on September 9, 2004.  The medical examiner testified that Diana=s head injuries were consistent with being swung, slammed, or thrown
against a hard surface.  The type of
force required to produce Diana=s head injury would be the equivalent of a thirty-mile-per-hour car
accident on an unrestrained person. 
Diana=s death was
classified as a homicide.

Homicide detective Cheryl Johnson was dispatched to the hospital.
Detective Johnson asked Mario and Veronica to accompany her to the police
station to determine what had caused Diana=s injuries.  However, before
leaving the hospital, Detective Johnson informed Mario and Veronica that they
were not under arrest and were free to leave at any time.








At the police station Detective Jose Hernandez was called in to
translate for Mario in Spanish.  About
twenty minutes into the conversation, Detective Hernandez decided to read Mario
the Spanish version of the Miranda warnings. Mario waived his rights and
voluntarily spoke with Detective Hernandez. Although Detective Hernandez read
Mario his Miranda warnings, he was not under arrest and was free to
leave at any time.  Because Mario was not
under arrest or detention, Detective Hernandez did not notify the Mexican
Consulate. During the interview, Mario admitted that he had hit Diana twice on
the head and that the force from the first blow caused Diana to fall and hit
her head on the floor.  After the
interview was completed, Detective Johnson placed Mario in custody.

At trial, the jury found Mario guilty of serious bodily injury to a
child and  assessed punishment at fifty
years= confinement.

III. Vienna Convention








In his first issue, Mario claims the trial court erred by overruling
his objections and his motion to suppress evidence due to the police=s failure to notify the Mexican Consulate of his arrest and
detention.  In sum, Mario argues that his
confession to police should have been excluded from evidence based on the
detective=s alleged
violations of the Vienna Convention.  We
have previously addressed this issue in Sierra v. State.  157 S.W.3d 52, 59B60 (Tex. App.CFort Worth
2004, pet. granted).  Because we again
hold that the exclusionary rule is not an appropriate enforcement mechanism for
Vienna Convention violations, we need not address Mario=s contention that the Vienna Convention confers an individual right to
consular notification.  Likewise, we need
not determine whether Mario was detained under the meaning of the Vienna
Convention or whether he established a causal connection between the violation
of the convention and the making of his statements.   

Article 36 of the Vienna Convention provides that when nationals from
participating countries are arrested in the United States, the authorities are
required to inform the foreign national without delay that he has a right to
contact his nation=s
consulate.  Vienna Convention on Consular
Relations art. 36(1)(b), Apr. 24, 1963, 21 U.S.T. 77, 596 U.N.T.S. 261.  Additionally, the consular officials from the
foreign country shall have the right to visit their nationals in custody in the
United States.  Id. art.
36(1)(c).  Appellant argues that his
confession should have been suppressed because the police never notified him
that, as a Mexican national, he had a right to contact the Mexican Consulate,
nor did the police contact the consulate on his behalf.  We disagree.








The Texas Court of Criminal Appeals= decision Rocha v. State is the controlling law in this
case.  16 S.W.3d 1, 19 (Tex. Crim. App.
2000).  The court in Rocha held
that the article 38.23(a) exclusionary rule of the Texas Code of Criminal
Procedure does not apply to violations of treaties.  Id. at 18B19; see also Tex. Code
Crim. Proc. Ann. art. 38.23(a) (Vernon 2005).  Absent contrary directions from the United
States Supreme Court, the court of criminal appeals stated that it would not
enforce Vienna Convention violations claimed under the federal exclusionary
rule.  Rocha, 16 S.W.3d at
19.   This court is bound by the
precedent of the Texas Court of Criminal Appeals and has no authority to
disregard or overrule the precedent in Rocha.  See Wiley v. State, 112 S.W.3d 173,
175 (Tex. App.CFort Worth
2003, pet. ref=d).  Accordingly, we hold that the trial court did
not err by overruling Mario=s objections and denying his motion to suppress on this ground.  Therefore, we overrule Mario=s first issue.   

IV. Police Interpreter 

In his second issue, Mario complains that the trial court erred by
allowing testimony from an uncertified police interpreter regarding Mario=s allegedly incriminating statements. 
Detective Hernandez interviewed Mario in Spanish and a portion of the
interview was tape recorded.  The taped
portion of the interview was translated by a certified court interpreter.  The trial court allowed into evidence Mario=s statements made to Detective Hernandez before the recorder was
turned on.

Article 38.30(a) of the Texas Code of Criminal Procedure is the
relevant statute, which provides in pertinent part:








When
a motion for appointment of an interpreter is filed by any party or on motion
of the court, in any criminal proceeding, it is determined that a person
charged or a witness does not understand and speak the English language, an
interpreter must be sworn to interpret for [him].  Any person may be subpoenaed, attached or
recognized in any criminal action or proceeding, to appear before the proper
judge or court to act as interpreter therein, under the same rules and
penalties as are provided for witnesses. 

 

Tex. Code Crim. Proc. Ann. art. 38.30(a) (Vernon Supp. 2006). 
By its very terms, article 38.30(a) governs the use of interpreters in
court proceedings, not police interviews. 
What Mario is proposing would require every bilingual police officer to
be a certified interpreter in order to testify to a suspect=s incriminating statements or to record every conversation with a
non-English speaking suspect.  The
statute simply does not require this. 
Had the legislature had desired to impose this requirement, it would
have done so.  AWhere the statute is clear and unambiguous[,] the Legislature must be
understood to mean what it has expressed, and it is not for the courts to add
or subtract from such a statute.@  Coit v. State, 808
S.W.2d 473, 475 (Tex. Crim. App. 1991).








Mario also complains that Detective Hernandez was not proven to have
the interpretation skills required to admit evidence under Texas law.  We disagree. 
The evidence shows that Detective Hernandez spoke and understood both
English and Spanish.  Detective Hernandez
testified that he had spoken Spanish all of his life, tested out of Spanish in
college, and passed a test which enabled him to be a translator for the Fort
Worth Police Department.  The licensed
transcription of the audiotaped portion of the interview establishes that
Detective Hernandez was able to converse with Mario in Spanish without an
interpreter and then testify in English concerning that conversation.

In summary,  Mario has not
pointed us to any authority, nor have we discovered any, that would require
exclusion of Detective Hernandez=s testimony.  Accordingly, we overrule
Mario=s second issue.  

V. Motion to Suppress Physical Evidence

In his third issue, Mario asserts that the trial court erred by
overruling his motion to suppress evidence and by allowing introduction of
incriminating evidence recovered from Mario=s residence.  Specifically,
Mario claims that a close reading of the search warrant and supporting
affidavit shows that there were insufficient facts stated to establish probable
cause to search for and seize the items. 
We disagree. 








When reviewing a magistrate=s determination of probable cause to issue a search warrant, we apply
the deferential standard of review articulated by the United States Supreme
Court in Illinois v. Gates, 462 U.S. 213, 236, 103 S. Ct. 2317, 2331
(1983).  Under this standard, we uphold
the probable cause determination Aso long as the magistrate had a >substantial basis for . . . conclud[ing]= that a search would uncover evidence of wrongdoing.@  Id. at 236, 103 S. Ct.
at 2331 (quoting Jones v. United States, 362 U.S. 257, 271, 80 S. Ct.
725, 736 (1960), overruled on other grounds by U.S. v. Salvucci, 448
U.S. 83, 100 S. Ct. 2547 (1980)); see Swearingen v. State, 143 S.W.3d
808, 810 (Tex. Crim. App. 2004). 

In assessing the sufficiency of an affidavit for a search warrant, we
are limited to the four corners of the affidavit.  Hankins v. State, 132 S.W.3d 380, 388
(Tex. Crim. App.), cert. denied, 125 S. Ct. 358 (2004); Jones v.
State, 833 S.W.2d 118, 123 (Tex. Crim. App. 1992), cert. denied, 507
U.S. 921 (1993).  Furthermore, we
interpret the affidavit in a common sense and realistic manner, recognizing
that the magistrate was permitted to draw reasonable inferences.  Hankins, 132 S.W.3d at 388; Jones,
833 S.W.2d at 124.

Detective Johnson submitted a search warrant affidavit for the
residence where Mario, Veronica, and Diana lived together and the offense
occurred.  In the affidavit, Detective
Johnson described the premises to be searched, stated her belief that the
offense of injury to a childCserious bodily injury had been committed, and stated that evidence
including blood, weapons, bedding, photographs, and other evidence related to
the offense could be found on the premises. 
The facts Detective Johnson set out in order to establish probable
described the extent and seriousness of Diana=s injuries and referenced Diana being injured while inside the home.








Based on the facts alleged in the affidavit, we conclude that the magistrate
had a substantial basis for concluding that a search would uncover evidence of
wrongdoing, and we therefore uphold the probable cause determination.  Gates, 462 U.S. at 236, 103 S. Ct. at
2331.  Furthermore, our common sense and
realistic  interpretation of the
affidavit shows that the magistrate drew reasonable inferences from the
information contained therein.  Hankins,
132 S.W.3d at 388; Jones, 833 S.W.2d at 124.

We overrule Mario=s third issue.

VI. Admission of Photographs 

In his fourth issue, Mario claims the trial court erred and abused its
discretion by admitting, over objection, photographs of Diana.  Mario asserts that the prejudicial effect of
the photographs substantially outweighed their probative value.  Again, we disagree.  








Although relevant, evidence may be excluded if its probative value is
substantially outweighed by the danger of unfair prejudice, confusion of the
issues, or misleading the jury, or by considerations of undue delay or needless
presentation of cumulative evidence.  Tex. R. Evid. 403.  The admissibility of photographs over a
challenge is within the sound discretion of the trial court.  Moreno Denoso v. State, 156 S.W.3d
166, 177 (Tex. App.CCorpus
Christi 2005, pet. ref=d); see
Rojas v. State, 986 S.W.2d 241, 249 (Tex. Crim. App. 1998); Montgomery
v. State, 810 S.W.2d 372, 378B80 (Tex. Crim. App. 1990).  The
trial court=s decision
will be reversed only if it was Aoutside the zone of reasonable disagreement.@  Moreno Denoso, 156
S.W.3d at 177 (quoting Narvaiz v. State, 840 S.W.2d 415, 429 (Tex.
1992), cert. denied, 507 U.S. 975 (1993)).

A court may consider the following factors in determining whether the
probative value of photographs is substantially outweighed by the danger of
unfair prejudice:  (1) the number of
exhibits offered, (2) their gruesomeness, (3) their detail, (4) their size, (5)
whether they are offered in color or in black and white, (6) whether they are
close‑up, and (7) whether the body depicted is clothed or naked.  Sosa v. State, Nos. 14‑03‑01116‑CR,
14‑03‑01117‑CR, 14‑03‑01118‑CR, 2005 WL
171352, at *3 (Tex. App.CHouston
[14th Dist.] Jan. 27, 2005, pet. ref=d); see Rojas, 986 S.W.2d at 249.  Autopsy photographs are generally admissible
unless they depict mutilation caused by the autopsy itself.  Frank v. State, 183 S.W.3d 63, 77
(Tex. App.CFort Worth
2005, pet. ref=d); see
Rojas, 986 S.W.2d at 249. 
Photographs that depict the nature, location, and extent of a wound have
been declared probative enough to outweigh any prejudicial effect.  Frank, 183 S.W.3d at 78; see Legate
v. State, 52 S.W.3d 797, 807 (Tex. App.CSan Antonio 2001, pet. ref=d). 








Here, Mario complains of the admission of two sets of
photographs.  State=s Exhibits 21 through 23 are eight-by ten-inch color photographs of
Diana in the hospital.  The photographs
were introduced into evidence during the testimony of Dr. Yancy, who treated
Diana at Cook Children=s Medical
Center. The photographs showed Diana with medical equipment and showed the
wounds to her head and back.  Dr. Yancy
testified that the photographs accurately depicted Diana=s appearance on September 9, 2004.  Dr. Yancy also testified to the nature and
severity of Diana=s multiple
injuries.  Visual evidence accompanying
oral testimony is not cumulative or of insignificant probative value.  Chamberlain v. State, 998 S.W.2d 230,
237 (Tex. Crim. App. 1999), cert. denied, 528 U.S. 1082 (2000).  Therefore, we hold that the probative value
of the hospital photographs was not substantially outweighed by the danger of
unfair prejudice.  See Tex. R. Evid. 403.  Accordingly, the trial court did not abuse
its discretion by admitting State=s Exhibits 21 through 23.  See
Frank, 183 S.W.3d at 78.   








The second set of photographs Mario complains of are Diana=s autopsy photographs.  State=s Exhibits 24 through 31 are eight-by ten-inch color autopsy
photographs of Diana admitted during the testimony of Dr. Sisler, the medical
examiner who performed Diana=s autopsy.  Dr. Sisler testified
that the autopsy photographs would assist the jury in understanding the nature
of Diana=s injuries.  State=s Exhibits 24[2]
and 25[3]
show injuries to Diana=s back, and
State=s Exhibit 26 depicts the bruising on Diana=s lower lip.  State=s Exhibits 27 through 31 depict Diana=s extensive head injuries.  Some
of the head photographs reveal Diana=s scalp pulled back to show the bleeding underneath Diana=s scalp.  Other photographs show
Diana=s swollen exposed brain and depict the pooling of blood on the
brain.  The admitted photographs are
gruesome and show a considerable amount of blood on the brain.  However, the photographs depict the wounds
Diana suffered and are no more gruesome than the facts of the offense
itself.  See Sosa, 2005 WL 171352,
at *3; see also Sonnier v. State, 913 S.W.2d 511, 519 (Tex. Crim. App.
1995).








Dr. Sisler testified that the manner of Diana=s death was homicide and that the cause of death was blunt force trauma
to the head.  He further testified about
her injuries and the blood found on her brain, which is typically not supposed
to be there.  The autopsy photographs,
coupled with Dr. Sisler=s testimony,
provided crucial evidence of the severe force used by Mario to inflict Diana=s injuries.  Therefore, we hold
that the probative value of the photographs was not substantially outweighed by
their prejudicial effect.  See Tex. R. Evid 403. Thus, the trial court
did not abuse its discretion by admitting State=s Exhibits 24 through 31.  See
Frank, 183 S.W.3d at 78.   

We overrule Mario=s fourth issue.

VII. Knowing or Reckless

In his fifth issue, Mario asserts that the trial court erred by
overruling his motion for an instructed verdict because there was insufficient
evidence that he knowingly committed the offense.  In his sixth issue, Mario contends the trial
court erred by refusing to charge the jury on the lesser included offense of
reckless injury to a child.  Because
Mario=s contentions under his fifth and sixth issues both relate to the
lesser included offense of reckless injury to a child we shall discuss them
jointly.

A. Standards of Review 

1. Motion for Instructed Verdict 








A challenge to the denial of a motion for instructed verdict is
actually a challenge to the legal sufficiency of the evidence.  Madden v. State, 799 S.W.2d 683, 686
(Tex. Crim. App. 1990), cert. denied, 499 U.S. 954 (1991);  Jackson v. State, 50 S.W.3d 579, 597
(Tex. App.CFort Worth
2001, pet. ref=d).  In reviewing the legal sufficiency of the
evidence to support a conviction, we view all the evidence in the light most
favorable to the verdict in order to determine whether any rational trier of
fact could have found the essential elements of the crime beyond a reasonable
doubt.  Jackson v. Virginia, 443
U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Hampton v. State, 165 S.W.3d
691, 693 (Tex. Crim. App. 2005).  This
standard gives full play to the responsibility of the trier of fact to resolve
conflicts in the testimony, to weigh the evidence, and to draw reasonable
inferences from basic facts to ultimate facts. 
Jackson, 443 U.S. at 319, 99 S. Ct. at 2789. 








Mario was charged with and convicted of knowingly causing serious
bodily injury to a child.  See Tex. Penal Code Ann. ' 22.04(a)(1) (Vernon Supp. 2006).  Because injury to a child is a result‑oriented
crime, the culpable mental state relates to the result of the defendant=s conduct, and the conduct must be done with the required culpability
to effect the result.  See Patterson
v. State, 46 S.W.3d 294, 301 (Tex. App.CFort Worth 2001, no pet.). 
Proof of a culpable mental state generally relies upon circumstantial
evidence and ordinarily must be inferred from the acts, words, and conduct of
the accused and the surrounding circumstances. 
See Moore v. State, 154 S.W.3d 703, 712 (Tex. App.CFort Worth 2004, pet. ref=d).  The trier of fact is the
sole judge of the weight and credibility of the evidence.  See
Tex. Code Crim. Proc. Ann. art. 38.04 (Vernon 1979); Margraves v.
State, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000).  Thus, when performing a legal sufficiency
review, we may not re-evaluate the weight and credibility of the evidence or
substitute our judgment for that of the fact-finder.  Dewberry v. State, 4 S.W.3d 735, 740
(Tex. Crim. App. 1999), cert. denied, 529 U.S. 1131 (2000).  We must resolve any inconsistencies in the
evidence in favor of the verdict.  Curry
v. State, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).    

2. Requested Charge on Lesser Included Offense 

To determine whether a jury must be charged on a lesser included
offense, we apply a two‑step analysis. 
Salinas v. State, 163 S.W.3d 734, 741 (Tex. Crim. App. 2005); Moore
v. State, 969 S.W.2d 4, 8 (Tex. Crim. App. 1998).  The first step is to decide whether the
offense is a Alesser
included offense@ as defined
in article 37.09 of the code of criminal procedure.  Tex.
Code Crim. Proc. Ann. art. 37.09 (Vernon 2006); Salinas, 163
S.W.3d at 741; Moore, 969 S.W.2d at 8. 
AAn offense is a lesser included offense if . . . it is established by
proof of the same or less than all the facts required to establish the
commission of the offense charged.@  Tex. Code Crim. Proc. Ann. art. 37.09(1).  Here, the State concedes that reckless injury
to a child can be a lesser included offense of knowing injury to a child.  Thus, the first prong is met.  








Second, some evidence must exist in the record that would permit a
jury to rationally find that if the defendant is guilty, he is guilty only of
the lesser offense.  Salinas, 163
S.W.3d at 741; Rousseau v. State, 855 S.W.2d 666, 672B73 (Tex. Crim. App.), cert. denied, 510 U.S. 919 (1993); Royster
v. State, 622 S.W.2d 442, 446 (Tex. Crim. App. 1981).  The credibility of the evidence and whether
it conflicts with other evidence or is controverted may not be considered in
determining whether the lesser included offense should be submitted.  See Gadsden v. State, 915 S.W.2d 620,
622 (Tex. App.CEl Paso
1996, no pet.).  Regardless of its
strength or weakness, if more than a scintilla of evidence raises the issue
that the defendant was guilty only of the lesser offense, the charge must be
given.  Bignall v. State, 887
S.W.2d 21, 23 (Tex. Crim. App. 1994);  Saunders
v. State, 840 S.W.2d 390, 391 (Tex. Crim. App. 1992).  In deciding whether a lesser included offense
instruction is warranted, we are required to view the evidence in the light
most favorable to Mario and give him the benefit of reasonable inferences from
the evidence, without regard to whether it is credible, controverted, or in
conflict with other evidence.  Curtis,
89 S.W.3d at 179.








An accused is guilty only of a lesser included offense if there is
evidence that affirmatively rebuts or negates an element of the greater offense
or if the evidence is subject to different interpretations, one of which rebuts
or negates the crucial element.  See
Schweinle v. State, 915 S.W.2d 17, 19 (Tex. Crim. App. 1996); Ramirez v.
State, 976 S.W.2d 219, 226B27 (Tex. App.CEl Paso
1998, pet. ref=d).  It is not enough that the jury may disbelieve
crucial evidence pertaining to the greater offense.  See Skinner v. State, 956 S.W.2d 532,
543 (Tex. Crim. App. 1997), cert. denied, 523 U.S. 1079 (1998). 

3. Culpable Mental States  

Section 22.04(a)(1) of the Texas Penal Code defines the offense of
serious bodily injury to a child.  It
provides in relevant part that a person commits an offense if he knowingly or
recklessly, by act or omission, causes serious bodily injury to a child.  See Tex.
Penal Code Ann. '
22.04(a)(1).  The penal code defines the
relevant culpable mental states as follows:

(b) A
person acts knowingly, or with knowledge, with respect to the nature of his
conduct or to circumstances surrounding his conduct when he is aware of the
nature of his conduct or that the circumstances exist.  A person acts knowingly, or with knowledge,
with respect to a result of his conduct when he is aware that his conduct is
reasonably certain to cause the result.

 

(c) A
person acts recklessly, or is reckless, with respect to circumstances
surrounding his conduct or the result of his conduct when he is aware of but
consciously disregards a substantial and unjustifiable risk that the
circumstances exist or the result will occur. 
The risk must be of such a nature and degree that its disregard
constitutes a gross deviation from the standard of care that an ordinary person
would exercise under all the circumstances as viewed from the actor=s
standpoint.

 








Tex. Penal Code Ann. ' 6.03(b),
(c) (Vernon 2003).  Injury to a child is
a result‑oriented or Aresult of conduct@ crime.  That is, the culpable
mental state relates not to the nature of or circumstances surrounding the
charged conduct, but to the result of the defendant=s conduct.  See Patterson,
46 S.W.3d at 301.  Thus, because injury
to a child is a Aresult of
conduct@ crime, proof that a defendant knowingly Acaused@ injury to a
child requires evidence that the defendant was aware with reasonable certainty
that the injury would result from his conduct. 
Thornton v. State, 994 S.W.2d 845, 849 (Tex. App.CFort Worth 1999, pet. ref=d). 

B. Application 

We shall therefore examine the evidence to determine (1) if there is
no evidence that Mario committed the crime of knowingly causing serious bodily
injury to a child and (2) if there is some evidence that if Mario is guilty he
is not guilty of knowingly causing serious bodily injury to a child but only of
recklessly causing serious bodily injury to a child.  See Salinas, 163 S.W.2d at 745.  

Here Mario argues that his description of the events as a Areaction@ and a Afit@ established
the suddenness of his actions and raised the issue of recklessness.  It is undisputed that Mario struck Diana in
the head more than once with extreme force. 
Based upon the considerable medical testimony and other evidence, it is
also clear that these blows caused Diana=s serious bodily injuries and ultimately led to her death.








Any adult, such as Mario, would be aware with reasonable certainty
that serious injury would result from striking a three-year-old several times
in the head with extreme force.  See
Thornton, 994 S.W.2d at 849.  Based
on our review of this evidence in the light most favorable to the verdict, we
hold that there is evidence of Mario=s guilt of knowingly causing serious bodily injury to a child and
determine that a rational trier of fact could have found the essential elements
of the crime beyond a reasonable doubt.  Jackson,
443 U.S. at 319, 99 S. Ct. at 2789; Hampton, 165 S.W.3d at 693.  Further, since Mario would have known with
reasonable certainty that his actions were directly harmful to Diana and did
not merely create an unjustifiable risk of harm but were necessarily
harmful to her, we hold that the evidence does not support the theory that
Mario might only be guilty of reckless injury to a child.  See Downing v. State, 761 S.W.2d 881,
883 (Tex. App.CFort Worth
1988, writ ref=d).

We overrule Mario=s fifth and sixth issues. 

VIII. State=s Comment Regarding Mario=s Failure to Testify 

In his final issue, Mario argues that the trial court erred in
overruling his motion for mistrial after sustaining his objection and instructing
the jury to disregard the prosecutor=s comment on Mario=s failure to testify.  At trial
Mario objected to two portions of the State=s argument.  The first portion
of the objected to argument was as follows:








[Prosecutor:]
You=ve
heard a little bit about the Defendant saying it was a reaction.  It was a fit. 
Ladies and gentlemen, causing that kind of head trauma to a poor,
defenseless little girl, a three year old who wasn=t
doing anything but writing her alphabet, he knew what he was doing.  And how do you know that?  Because he admits to you that he hit her more
than once.  It=s
plain and simple.  He knew what he was
doing on that day.  And let=s
talk about some of the things that the defendant told you. 

 

At this point defense counsel objected that this was a reference to
Mario=s failure to testify.  The trial
court sustained the objection and instructed the jury to disregard, but denied
Mario=s motion for a mistrial.

To constitute
reversible error, the contested jury argument must be extreme or manifestly
improper, or it must inject new and harmful facts into evidence.  Sandoval v. State, 52 S.W.3d 851, 857
(Tex. App.CHouston [1st Dist.] 2001, pet. ref=d).  Except in the most blatant cases, an
instruction to disregard a comment on an accused=s failure to
testify will cure any prejudicial effect caused by the improper comment.  Moore v. State, 999 S.W.2d 385, 405 (Tex.
Crim. App. 1999), cert. denied, 530 U.S. 1216 (2000); Fuentes v.
State, 991 S.W.2d 267, 275 (Tex. Crim. App.), cert. denied, 528 U.S.
1026 (1999). 








When the trial court
sustains an objection and instructs the jury to disregard but denies a
defendant=s motion for a mistrial, the issue is
whether the trial court abused its discretion in denying the mistrial.  Hawkins v. State, 135 S.W.3d 72, 77
(Tex. Crim. App. 2004).  Only in extreme
circumstances, when the prejudice caused by the improper argument is incurable,
i.e., Aso prejudicial
that expenditure of further time and expense would be wasteful and futile,@ will a mistrial
be required.  Id. (quoting Ladd
v. State, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999), cert. denied,
529 U.S. 1070 (2000)); see also Simpson v. State, 119 S.W.3d 262, 272
(Tex. Crim. App. 2003), cert. denied, 542 U.S. 905 (2004).  In determining whether the trial court abused
its discretion in denying the mistrial, we balance three factors:  (1) the severity of the misconduct (prejudicial
effect), (2) curative measures, and (3) the certainty of conviction absent the
misconduct.  Hawkins, 135 S.W.3d
at 77; Mosley v. State, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op.
on reh=g), cert.
denied, 526 U.S. 1070 (1999).








Based upon the evidence presented at trial, we conclude that the State=s argument was referring to Mario=s out-of-court statements that had been admitted into evidence.  Thus, the argument did not inject new and
harmful facts into evidence, nor can it be categorized as extreme or manifestly
improper.  See Sandoval, 52 S.W.3d at
857.  Weighing the appropriate factors,
we hold that the trial court did not abuse its discretion by denying Mario=s motion for a
mistrial because, (1) the misconduct, if any, was slight, (2) the trial court instructed the jury to disregard the complained
of argument, and (3) even without the argument there was overwhelming evidence
of Mario=s guilt supporting conviction. 
Thus, we hold the trial court did not abuse its discretion by denying
Mario=s request for a mistrial.  See
Hawkins, 135 S.W.3d at 77.       After defense counsel=s motion for a
mistrial was denied, the State=s argument
continued:

[Prosecutor:] Let=s talk about the first thing that
the Defendant told Vanessa.  AI don=t know what happened.@ 
When he calls her on the phone, he says, AI don=t know what happened.@ 
When they get to the hospital and they=re in the trauma room and then
Thomas Hassan, the patient advocate for Cook=s, what does he tell Thomas?  AWell, I think maybe she fell and hit her head at the post
office.@ 


 

Then we get down to the point where
the police are involved, and he voluntarily makes a statement, he says, AI hit her twice.@ 
He didn=t just hit her once.  He hit her twice, and he demonstrated for the
detective how he did it.  He hit her on
the head.  

 

And it=s not like somebody hitting me on
the head or a grownup on the head.  We=re talking about a fragile three
year old little girl.  The medical
examiner testified, Dr. Sisler, and you heard what he said.  This kind of head trauma would have come out
of a fall from a second story window. 
This kind of head trauma would be sustained in a car accident at 30
miles an hour from an unrestrained passenger.

 

This is not a
slap.  This is not just merely hitting
somebody in the head.  This is serious
head trauma.  And he also told you that a
child suffering this kind of head traumaC

At this point
defense counsel again objected that this argument was a comment on Mario=s failure to
testify.  The objection was overruled.








To determine if a
prosecutor=s comment violated article 38.08 and
constituted an impermissible reference to an accused=s failure to
testify, we must decide whether the language used was manifestly intended or
was of such a character that the jury naturally and necessarily would have
considered it to be a comment on the defendant=s failure to
testify.  Tex. Code Crim. Proc. Ann. art. 38.08 (Vernon 2005); see
Bustamante v. State, 48 S.W.3d 761, 765 (Tex. Crim. App. 2001); Fuentes,
991 S.W.2d at 275.  The offending
language must be viewed from the jury=s standpoint, and
the implication that the comment referred to the accused=s failure to
testify must be clear.  Bustamante,
48 S.W.3d at 765; Swallow v. State, 829 S.W.2d 223, 225 (Tex. Crim. App.
1992).  A mere indirect or implied
allusion to the defendant=s failure to testify does not violate the
accused=s right to remain
silent.  Wead v. State, 129 S.W.3d
126, 130 (Tex. Crim. App. 2004); Patrick v. State, 906 S.W.2d 481, 490B91 (Tex. Crim.
App. 1995), cert. denied, 517 U.S. 1106 (1996).








Here, we hold that this contested argument did not comment on Mario=s failure to testify.  It is
clear from the context of the argument that the State was referring the jury
back to the medical examiner=s testimony regarding Diana=s trauma.  Because the State=s argument did not reference Mario, we hold that the State=s argument was not
manifestly intended or of such a character that the jury naturally and
necessarily would have considered it to be a comment on the defendant=s failure to
testify.  Tex. Code Crim. Proc. Ann. art. 38.08; see Bustamante,
48 S.W.3d at 765; Fuentes, 991 S.W.2d at 275.

We overrule Mario=s final issue.

IX. Conclusion

Having overruled Mario=s seven issues, we affirm the trial court=s judgment.  

 

 

BOB
MCCOY

JUSTICE

 

PANEL B:   LIVINGSTON,
GARDNER, and MCCOY, JJ.

 

DO NOT PUBLISH

Tex.
R. App. P. 47.2(b)

 

DELIVERED: January 25, 2007











[1]See Tex. R. App. P. 47.4.





[2]Depicts
contusions on Diana=s
right back.





[3]Depicts
longitudinal incisions into the skin and underlying tissue to determine the
depth of bruising to Diana=s back.  The cuttings show extensive soft tissue
hemorrhage extending to the depth of the muscle of the back.